IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF THE DISTRICT OF COLUMBIA

———————————————————————

UNITED STATES,              )

                              )

        v.                 )     Crim. No. 21cr40

                              )     Hon. Trevor McFadden

GEOFFREY SILLS,         )     **UNDER SEAL**

       Defendant.       )

———————————————————————)

## DEFENDANT'S POSITION ON SENTENCING

Comes now Defendant Geoffrey Sills, by counsel, and notes the following objections to the Presentence Report ("PSR," Doc. 507).

### Guideline Calculation

**Group Comprising Robbery**

The PSR wrongly applies a Victim Related Adjustment of six levels under USSG 3A1.2(b) for an official victim (PSR para 59). Section 3A1.2(b) is restricted to offenses delineated in Chapter Two, Part A of the Guidelines for Offenses Against the Person. Robbery, however, falls under Part B of Chapter Two of the Guidelines for Economic Offenses.

The correct offense level for this count (and group) is 20, the Base Offense Level indicated by Section 2B3.1 to which no enhancements apply.

**Group Comprising Assaulting Law Enforcement with a Dangerous Weapon and Obstruction of Official Proceeding**

The PSR wrongly applies enhancements of eight and three levels, respectively, for interference with the "administration of justice (PSR paras 65 and 66). This Court has already declined to apply these enhancements for the reason that the electoral vote count of January 6th did not constitute the administration of justice. See *United States v. Seefried*, _____.

The PSR also wrongly adds six levels of enhancement under Section 3A1.2(b) for Official Victim (PSR para 67). Application Note 2 of Section 3A1.2, however, specifically excludes application of this enhancement to Obstruction of Law Enforcement calculated under Section 2A2.4.

The correct offense level for the count of Assault on Law Enforcement with a Dangerous Weapon is 13 – calculated under Section 2A2.4 as a Base Offense Level of 10 with three levels of enhancement under subsection (b)(1) for the use of a dangerous weapon and physical contact.

The correct offense level for the Obstruction of an Official Proceeding is 14 – calculated at the Base Offense Level of 14 under Section 2J1.2 without enhancements for impediment of the administration of justice as held by this Court in *Seefried*.

Section 3D1.3(a) attributes to this group the value of the most serious charge comprised therein - 14 for the count of Obstructing an Official Proceeding.

**Aggregate Guideline Calculus**

Section 3D1.4 posits the aggregate offense level of the two groups by adding one level to the offense level of the most serious group – i.e., the group solely comprising the Robbery count with an offense level of 20 – to yield an aggregate offense level for both counts of 21.

**Acceptance of Responsibility**

The PSR wrongly denies Defendant's acceptance of responsibility (PSR para 50) – notwithstanding he stipulated to the facts underpinning his conviction (Doc 427). Further, the PSR incorrectly states that Defendant submitted no additional statement (PSR para 49). Undersigned clearly recalls Defendant orally acknowledging responsibility for his offense conduct during his interview with the PSR's author.

Undersigned expects the government will not contest a two level reduction for acceptance of responsibility and will move a third level of reduction at the appropriate time.

Correctly calculated, Defendant's ultimate guideline range will be at a Level 18 of 27 to 33 months.

## Factors Warranting a Downward Departure

The PSR identifies no factors warranting a downward departure (PSR para 141).  In fact, this case is dense with them.

### Need to Avoid Sentencing Disparities

The government has shown remarkable leniency toward rioters unrelated to the riot of January 6th.  This Court has recognized in a ruling on a motion co-defendant Judd that "disparate charging decisions in similar circumstances may be relevant at sentencing." (Doc. 203 at 12). The murder of George Floyd ushered in months of riots across the country – nowhere more virulent that those in Portland, Oregon where the rioters tried to burn down a federal courthouse. Counsel for co-defendant Judd has submitted a precis of the cases prosecuted by the government in response to the Portland riots (Doc. 529-4).  The contrast between the government's charging decisions in Portland and in the January 6th cases is dramatic and disturbing.

Of 38 Portland cases tracked by counsel for co-defendant Judd, 30 were dismissed outright, and two were dismissed pursuant to diversion agreements.  Many of these entailed assaultive behavior far more severe than Defendant's – lasering officers' eyes (capable of causing permanent loss of vision), punching and kicking officers, throwing lit fireworks at them…   A small minority of three Portland defendants to have lasered officers in the eyes did not enjoy dismissal and received sentences of one day, six months home detention, and probation, respectively.  The only two cases to result in significant confinement entailed

defendants who had struck officers repeatedly about the head with a hammer in one instance and a baseball bat in the other.    These received 46 and 24 months respectively.[1]

There is no plausibly appropriate explanation for the sharply discrepant results of the Portland prosecutions and the government's charging decisions on the January 6th cases.

**Circumstances Not of Defendant's Making**

Defendant did not come to Washington that day with any intention of doing violence.  He carried a gas mask and tactical gear because he feared a terrorist attack (PSR para 23).  He came to Washington and he went to the Capitol because his President asked him to.

Just prior to the breach of the Capitol, President Trump exhorted the assembled protesters at the Ellipse.  He said, in part:

> "These people [referring to his crowd while addressing media] are not going to take it any longer."

> "They rigged an election."

> "We won this election and we won it by a landslide."

> "All of us here today do not want to see our election victory stolen."

> "We will never give up."

> "Our country has had enough and we will not take it anymore."

> "We will stop the steal."

> "If you don't fight like hell, you're not going to have a country anymore."

> "Peacefully and patriotically, make your voices heard."

> "We are going to the Capitol."

*Capitol riots: Did Trump's words at rally incite violence?* BBC News, January 13, 2021, www.bbc.com.

---

[1] United States v. Jacob Gaines, 3:20cr290; United States v. Dakota Horton, 3:20cr419.

Whether or not the penultimate sentence could reasonably be expected to calm the already agitated crowd, the sitting President of the United States told the crowd to go the Capitol and "Stop the Steal."

Once there, Defendant found himself in a maelstrom.  The Capitol and the Metropolitan Police were grossly under resourced (the Congressional leadership having days earlier refused National Guard help), and bereft of leadership, not to mention a plan.  The protest march became a riot.[2]

The mood of a mob is a palpable thing – compelling to overwhelming to those inside it. That is why mobs are dangerous.

**[REDACTED CONTENT]**

**Conditions of Pretrial Confinement**

Defendant will speak to the conditions of his confinement for a year and a half at the Northern Neck Regional Jail.  The Court, however, may safely infer substandard treatment of inmates from the facts of Defendant's having contracted MRSA at the facility (PSR para 95) and the Marshal's Service having moved January 6th defendants *en mas*se from the facility.

**<u>Conclusion</u>**

---

[2] The extent to which the rioters were instigated or abetted by official actors – overt and otherwise – has not been, and may never be, satisfactorily established.  Defendant has conceded the facts of his conduct.  Should a determinative official role in the day's debacle ever be established, however, his conviction would be susceptible to scrutiny under the principle of Entrapment by Estoppel.

> "A criminal defendant may assert an entrapment-by-estoppel defense when the government affirmatively assures him that certain conduct is lawful, the defendant thereafter engages in the conduct in reasonable reliance on those assurances, and a criminal prosecution based upon the conduct ensues.

*United States v. Aquino-Chacon*, 109 F. 3d 936, 938-39 (4th Cir. 1997) (citing *Raley v. Ohio,* 360 U.S. at 423, 438-39 (1959); *United States v. Clark*, 986 F.2d 65, 69 (4th Cir. 1993); *United States v. Howell*, 37 F.3d 1197, 1204 (7th Cir. 1994)).

Defendant has absolutely no criminal history.  He did not arrive that day planning or expecting to wreak violence.  There is no evidence that he injured anyone.  He went because his President asked him to.  Once there, he stepped into a maelstrom not of his making.

[REDACTED CONTENT]

He is very sorry and will never replicate his conduct of January 6th.

Throughout the period of his pretrial confinement, Defendant's father's health has declined precipitously.  He suffers Thalassemia (for which he has received three transfusions in the last month), Diabetes, and has recently fractured his femur and his tibia.

Defendant has already been confined too long.

Respectfully submitted,

GEOFFREY SILLS
By Counsel

_____/s/_____
John C. Kiyonaga

510 King Street, Ste. 400
Alexandria, Virginia 22314
Telephone: (703) 739-0009
Facsimile: (703) 340-1642
E-mail: john@johnckiyonaga.com

Counsel for the Defendant

<u>Certificate of Electronic Service</u>

I hereby certify that on March 7, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System.

_____/s/_____
John C. Kiyonaga