**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**

  **v.**

**GEOFFREY SILLS,**

  **Defendant.**

**Case No. 21-cr-40-06 (TNM)**

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. The defendant Geoffrey Sills was convicted at a stipulated trial of one count of Assaulting, Resisting, or Impeding Certain Officers with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b), one count of Robbery, in violation of 18 U.S.C. § 2111, and one count of Obstruction of an Official Proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2. For the reasons set forth herein, the government requests that this Court sentence Sills to 108 months of incarceration, at the midpoint of his 97 to 121 month guideline range as calculated by the government; 36 months of supervised release; $2,000 restitution, and a $300 mandatory assessment.

**I.      INTRODUCTION**

The defendant, Geoffrey Sills, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election,

injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Sills, a 3D artist from Mechanicsville, Virginia, traveled to Washington, D.C. on January 6, 202, to attend the "Stop the Steal" rally at the Ellipse in downtown D.C. Wearing a black "Make America Great Again" (MAGA) hat, a distinctive striped shirt, black goggles, and a black gas mask, Sills joined the crowd illegally gathering on the West Front of the U.S. Capitol grounds at approximately 2:13 p.m. Over the next hour, Sills participated in the continuous assault on officers defending the West Front and at the Lower West Terrace tunnel at the U.S. Capitol. Sills threw several pole-like objects at the officers as they retreated from the West Front, and then entered the Lower West Terrace tunnel, where he -pointed a flashing strobe light at the police line, stole a department-issued baton from a Metropolitan Police Department officer, and used the extended baton to repeatedly strike at multiple officers on the police line. All the while, Sills was filming the events and posting them to the app Instagram under his username @geoff_sills.

The government recommends that the Court sentence Sills to 96 months' incarceration for his conviction of violating 18 U.S.C. §§ 111(a) and (b), 2111, and 1512(c)(2), and 2. A 108-month sentence properly reflects the sentencing considerations set forth in 18 U.S.C. § 3553(a).

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

The government refers to the court to the stipulated Statement of Offense filed in this case, ECF No. 427, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### *Injuries Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id.* at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

### *The West Front and Lower West Terrace Tunnel of the U.S. Capitol*

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible. Initiated by the most fervent smaller groups and individuals within the crowd, and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



**Figure 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.**

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]"

These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A. At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier. Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.   By 12:58 p.m., the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1.   They flooded the area labeled "Lower West Plaza" Area C on Government's Exhibit 1, pushing against the barricade there.





*Figure 2A-D: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.  For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.





*Figure 3A-D: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).   In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 p.m., Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.   It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately.   This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the

thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.   With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.





*Figure 4A-C: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT").   The entrance usually consists of a flight of stairs leading to a doorway.   On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that

was approximately 15 feet long.   That tunnel led to two sets of metal swinging doors inset with glass.   On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.   The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.   This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day. Figure 5; "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



*Figure 5: View of the Inaugural Platform with Entrance to the Lower West Terrace Tunnel Indicated*

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors were closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.   Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance.   Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the glass on the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist. The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items. Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray. At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.   And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me.   So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.   That's about from the distance where I'm sitting here on the dais to that back wall.   And from that office in close proximity to where you all held the line, I listened to you struggle.   I listened to you yelling out to one another.   I listened to you care for one another, directing

people back to the makeshift eyewash station that was at the end of our hall.   And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."[2]   .

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.   The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.   Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.[3]

---

[2] Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack

[3] *Id.* (Statement of Sgt. Aquilino Gonell).

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor.   MPD Officer Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service.[4]

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 p.m.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.   It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress. *See* Sentencing Exhibit 001, Video from MPD Commander Kyle.

---

[4] *Id.* (Statement of Officer Michael Fanone).

**B.      Sills's Role in the January 6, 2021 Attack on the Capitol**

Sills lives in Mechanicsville, Virginia, and traveled from Virginia to Washington, D.C., via metro on January 6, 2021. The purpose of Sills's trip to Washington, D.C. was to protest Congress' certification of the Electoral College.

Financial account records show Sills made multiple purchases at stores in November 2020 (including "Infidel Body Armor," "Freedom Fighters Tactic," and "Cheaper than Dirt"), which sell body armor, weapons, gas masks, and other combat equipment. Indeed, on January 6, Sills arrived in the nation's Capital armed with such a gas mask, and wearing a black "Make America Great Again" (MAGA) hat, a distinctive grey striped shirt, tactical gloves, ear protection, and black goggles.



***Figure 6: Screenshot from Sentencing Exhibit 002, YouTube Video "Just Another Channel,"
at 46:24, Depicting Sills's Gas Mask, Ear Protection, and Googles***

On January 6, 2021, Sills boarded a Metro train in Franconia-Springfield, VA. Sills arrived at the Federal Triangle Metro station, close to the Ellipse in downtown, D.C., where former

President Trump was speaking at the "Stop the Steal" rally. Then, after the completion of the speeches, at approximately 2:13 p.m., Sills joined the crowd gathering on the West Front of the U.S. Capitol grounds. At approximately 2:28 p.m., rioters breached the line of law enforcement officers on the West Front of the Capitol grounds. Sills joined the line of rioters that pushed the police back. Sills then threw several pole-like objects at the officers as they retreated.





*Figures 7A and B: Screenshots from Sentencing Exhibit 003, YouTube Video "Political Trance," at 5:20 to 5:45 minutes, Depicting Sills Throwing Objects at Police Line*

15

At approximately 2:40 p.m., when officers retreated from the West Front up to the Lower West Terrace, Sills followed the officers up to the Terrace, and into the tunnel created by the inauguration stage. Sills and other rioters then approached a glass door to the U.S. Capitol building, emblazoned with the sign "Members Entrance Only." From approximately 2:40 p.m., a group of police officers held a line at the second set of glass doors inside the tunnel, fighting back a group of rioters, including Sills, until approximately 3:19 p.m. *See*, Figure 8A and B (Exhibit 004, Cantwell 242 Video).

At approximately 2:43 p.m., Sills forcefully wrested away a police department-issued baton from the person of MPD Officer C.W., who was defending the entrance door to the U.S. Capitol.



***Figures 8A and B: Screenshots from Sentencing Exhibit 004, Video Taken by Lewis Eason Cantwell, from 00:27 to 1:16 Depicting Sills Stealing Baton from the Police Line***

A few minutes later, Sills exited the tunnel holding an extended baton. As Sills exited the tunnel into the sea of rioters, Sills lifted the baton above his head in what appears to be an effort to signal and galvanize the crowd.



***Figure 9: Screenshot from Sentencing Exhibit 005, CCV at the Lower West Terrace Tunnel, at 2:46:48 p.m.***

At approximately 2:49 p.m., Sills re-entered the tunnel, and moved towards the police line at the door. At approximately 2:52 p.m., Sills, still armed with the stolen baton, then pointed a flashing strobe light at the police line, disorienting officers. *See* Figure 10 (Exhibit 006) below.



***Figure 10: Screenshot from Sentencing Exhibit 006, CCV at the Lower West Terrace Tunnel, at 2:52:16 PM***

From at least approximately 2:53 p.m. until approximately 2:59 p.m., Sills used Officer C.W.'s extended police baton to repeatedly strike at officers on the police line. One of those strikes by Sills struck Officer V.B.'s left arm while Officer V.B. was struggling with another rioter. Officer V.B. sustained multiple bruises from strikes on various parts of his body from the assaults he suffered on January 6.   The officer recalled struck on the head at one point by the baton wielded by Sills. Officer V.B. also suffered from a severe burning sensation all over his body from the chemical irritants in the air and vomited as a result of exposure to the irritants. However, Officer V.B. could not determine whether his injuries came from Sills or one of the many other rioters that assaulted him that day.

18





*Figures 11A and B: Screenshots from Sentencing Exhibit 006, CCV at the Lower West Terrace Tunnel at 2:52:43 PM and 2:53:21 PM*



***Figure 12: Screenshot from Sentencing Exhibit 007 Video taken by Photojournalist Jon Farina at 2:09 minutes***

Also during that time frame, as shown in Figures 13-15 below, Sills hit Officer C.W., the same individual from whom Sills stole the baton minutes before. As Officer C.W. later recalled, he was hit in the head by a swinging baton from one of the rioters in the tunnel and had a visible injury to his forehead at the end of the day.   However, because he was attacked so many times on January 6, it is impossible to determine whether the injury to Officer C.W.'s forehead was the result of Sills's assault, or whether Officer C.W.'s injury resulted from a blow struck by one of the other rioters who assaulted him that day.



***Figure 13: Screenshot from Sentencing Exhibit 005, CCV at the Lower West Terrace Tunnel, at 2:58:31 PM***



***Figure 14: Screenshot from Sentencing Exhibit 007, video taken by Photojournalist Jon Farina, at 8:29-8:39 minutes***



*Figure 15: Screenshot from Sentencing Exhibit 008, video taken by defendant Yvonne St. Cyr, at 00:48 minutes, depicting Sills Using Baton to Strike at Officer C.W.*

Then, at approximately 3:00 p.m., Sills exited the tunnel with the extended baton over his

head. Sills subsequently left the inaugural stage, went to the West Front, and left the area.

22



***Figure 16: Screenshot from Sentencing Exhibit 006, CCV at the Lower West Terrace Tunnel, at 3:00:12 PM***

All the while he was at the Capitol, Sills recorded and posted his violent activities at the Capitol on Instagram. That evening, Sills posted a compilation of video clips from the day on Instagram, with captions including "visited the Capitol today," "made some friends" and "took a tour," accompanying images of himself and others attacking the police line and flooding into the Lower West Terrace tunnel. On or around January 7, 2021, Sills deleted his Instagram account.



*Figures 17A and B: Screenshots from Sentencing Exhibit 009, an Instagram Video from account @geoff_sills*

On June 18, 2021, agents arrested Sills and executed a search warrant at his residence. Agents recovered multiple items, including tactical-style gloves with knuckle protection, black googles, a black flashlight with strobe function, a black gas mask, and a black riot-style baton, consistent with the one stolen from Officer C.W.

Sills, through his family members, has raised over $25,000 in an online campaign styled as "Christian Patriot Geoffrey Sills January 6." See https://www.givesendgo.com/G26Y7 (last

24

accessed March 13, 2023). The website indicates Sills "now faces a long, expensive legal fight for a fair judicial process against the enormous DC machine and their false narrative about that day. They seem to be simply bent on punishing patriots who truly love this country."[5]

## III.     THE CHARGES AND PLEA AGREEMENT

On December 1, 2021, a federal grand jury returned the Fifth Superseding indictment charging Sills and eight co-defendants who committed similar assaults on the West Front and Lower West Terrace. ECF No. 179. On, August 23, 2022, Sills was convicted of Count 13 (Robbery, in violation of 18 U.S.C. § 2111), Count 15 (Assaulting, Resisting, or Impeding Certain Officers with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b)), and Count 34 (Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2) at a stipulated trial. ECF No. 427. The remaining counts will be dismissed at the sentencing.

## IV.     STATUTORY PENALTIES

Sills now faces sentencing on one count of 18 U.S.C. § 111(a)(1) and (b), one count of 18 U.S.C. § 2111, and one count of 18 U.S.C. §§ 1512(c)(2) and 2.

As noted by the Presentence Report issued by the U.S. Probation Office, Sills faces up to 15 years of imprisonment on Count 13, and up to 20 years of imprisonment on each of Counts 15 and 34, a term of supervised release of not more than three years, a fine up to $250,000 on each count, and a mandatory special assessment of $100 per count.

---

[5] The government will not be seeking a fine in this case, as this website purports to help pay Sills's legal bills. But, the government believes this is relevant information for the Court to consider.

25

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government has submitted its objections to the calculation of the draft PSR. The government sets forth its calculation of the guidelines below, noting where it differs from the calculations of the United States Probation Office.

### A.  Guidelines Offense Level Analysis

**Robbery, in violation of 18 U.S.C. § 2111**

For Count Thirteen, charging robbery in violation of 18 U.S.C. § 2111, the correct guideline calculation is as follows:

| Guidelines Manual Provision | Description of Provision | Levels |
|---|---|---|
| U.S.S.G. § 2B3.1(a) | Base Offense Level | 20 |
| U.S.S.G. § 2B3.1(b)(3) | Bodily injury | +2 |
| U.S.S.G. § 3A1.2   (c) | Victim was Government Officer | +6 |
| TOTAL | | 28 |

**The Enhancement for Bodily Injury under U.S.S.G. § 2B3.1(b)(3) Should Apply to Sills's Section 2111 conviction.**

The PSR incorrectly states that there are no Specific Offense Characteristics for the Section 2111 offense, explaining in paragraph 58, n.3 that although Officer C.W. was hit in the head by a swinging baton from one of the rioters, he was not able to determine which rioter hit him, and therefore USSG § 2B3.1(b)(3) was not applied. However, USSG § 2B3.1(b)(3) should be applied. Sills joined other rioters in the tunnel in assaulting police, including Officer C.W., and is

26

responsible for Officer C.W.'s injuries as relevant conduct under USSG §1B1.3(a)(1)(A) (aiding and abetting) and under USSG § 1B1.3(a)(1)(B) (in the scope and furtherance of the jointly undertaken criminal activity). Accordingly, there should be a +2 adjustment for this Specific Offense Characteristic.

### The Enhancement for Official Victim under U.S.S.G. § 3A1.2 Should Apply to Sills's Conviction for the Section 2111 robbery offense.

The PSR correctly applies the Official Victim Adjustment under USSG § 3A1.2; however, the basis for this adjustment is subparagraph (c), not subparagraph (b), cited in the PSR. Subparagraph (b) does not apply, because for the Section 2111 offense, the applicable Chapter Two guideline is *not* from Chapter Two, Part A, but instead is from Chapter 2, Part B

### Assaulting, Resisting, or Impeding Officers, in violation of 18 U.S.C. § 111(a)(1), (b)

The PSR did not calculate the guidelines offense level for Sills's Section 111 offense. Instead, the PSR first grouped the Section 1512 offense with the Section 111 offense, and then calculated a single offense level for both. This is contrary to the directive in U.S.S.G. § 1B1.1 (Application Instructions), which provides that if there are multiple counts of conviction, the base offense level, specific offense characteristics, and appropriate adjustments are to be calculated for each offense of conviction, and *then* the grouping rules in Chapter Three Part D are to be applied. USSG §1B1.1(a)(1)-(4). Accordingly, for the Section 111 offense, the government sets for the calculation below.

For Count Fifteen, charging assault in violation of 18 U.S.C. § 111(b), the guidelines calculation is:

| Guidelines Manual Provision | Description of Provision | Levels |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3) | Bodily Injury | +2 |
| U.S.S.G. § 2A2.2(b)(7) | Conviction under 111(b) | +2 |
| U.S.S.G. § 3A1.2 (b) & (c) | Victim was Government Officer | +6 |
| TOTAL | | 28 |

**The Enhancement for Official Victim under U.S.S.G. § 3C1.2(c) Applies to Sills's Section 111(b) Assault Offense**

The PSR correctly assigned a six-level enhancement to the Section 111 offense pursuant to U.S.S.G. 3A1.2(b), as the correct guideline is Section 2A2.2.

**<u>Obstruction of an Official Proceeding and Aiding and Abetting</u>**

For Count Thirty-Four, charging obstruction in violation of 18 U.S.C. § 1512(c)(2), the guidelines calculation is as follows:

| Guidelines Manual Provision | Description of Provision | Levels |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Injury/Property Damage to Obstruct | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Substantial Interference with the Administration of Justice | +3 |
| U.S.S.G. § 3A1.2 (c) | Victim was Government Officer | +6 |
| TOTAL | | 31 |

1. **The Two Enhancements Under U.S.S.G. § 2J1.2 for Causing or Threatening to Cause Physical Injury or Property Damage and Substantial Interference with the Administration of Justice Both Apply to the Section 1512(c)(2) Offense.[6]**

---

[6] The government is, of course, aware of this court's rulings on these enhancements in *United States v. Christian Secor*, 21-cr-157; *United States v. Timothy Hale-Cusanelli*, 21-cr-37, *United States v. Hunter Seefried*, 21-cr-287, and the other co-defendants in *United States v. Patrick McCaughey, et. al.*, 21-cr-40. The government writes here to preserve its arguments with respect to these enhancements.

United States Sentencing Guidelines ("USSG") § 2J1.2, which applies to the "Obstruction of justice," provides for an eight-level increase if the offense involved causing or threatening injury to a person or damage to property "in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B). It also provides for a three-level increase "if the offense resulted in substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2). The United States Probation Office ("USPO") has correctly concluded that both of these Specific Offense Characteristics Apply to Sills's Section 1512(c)(2) offense. PSR 65, 66.[7]

Any argument by Sills to the contrary lacks merit. The parties must account for U.S.S.G. § 2J1.2's text and commentary. *See* U.S.S.G. § 1B1.1(b) ("The court shall then consider … any other policy statements or commentary in the guidelines that might warrant consideration in imposing sentence."). Section 2J1.2's commentary provides a broad definition of "administration of justice." It defines the term "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; or *the unnecessary expenditure of substantial governmental or court resources*." USSG § 2J1.2 cmt. n.1 (emphasis added). This definition goes well beyond "a judicial or grand jury proceeding" to include the unnecessary expenditure of substantial "governmental" resources. *Id.* And because note 1 is part of the commentary of § 2J1.2 "that interprets or explains a guideline," it is "authoritative unless [the commentary] violates the Constitution or a federal statute, or is

---

[7]   All references to the PSR are to the draft PSR dated January 6, 2023.

inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993).

Although the commentary defines only the term "substantial interference with the administration of justice" in U.S.S.G. § 2J1.2(b)(2), and not the term "in order to obstruct the administration of justice" in U.S.S.G. § 2J1.2(b)(1)(B), Sills offers no sound reason to interpret the same term in two specific offense characteristics in the same guideline differently. The relevant term in both provisions, "administration of justice," is identical. And the operative verbs, "interfere[]" and "obstruct," carry the same meaning in this context. The adjective "substantial" does not change the meaning of "administration of justice," especially since the commentary repeats the word, requiring "the unnecessary expenditure of substantial governmental . . . resources." U.S.S.G. § 2J1.2 cmt. n.1. Thus, the term "in order to obstruct the administration of justice" in U.S.S.G. § 2J1.2(b)(1)(B) should be read to include obstructive conduct aimed at nonjudicial governmental activities. A different conclusion would lead to a result of two different meanings for the term "administration of justice" within the same guideline.

The definition of "administration of justice" in § 2J1.2 cmt. n.1 is consistent with the term's ordinary meaning, which can encompass the application or execution of any law, including the laws relating to the electoral certification. One meaning of "justice," for example, is "[t]he fair and proper administration of laws." Black's Law Dictionary (11th ed. 2019) (definition 4). And some cases have defined "administration of justice" to mean "the performance of acts or duties required by law," *Rosner v. United States*, 10 F.2d 675, 676 (2d Cir. 1926) (quotation omitted), or "the performance of acts required by law in the discharge of duties such as appearing as a witness and

giving truthful testimony when subpoenaed," *United States v. Partin*, 552 F.2d 621, 641 (5th Cir. 1977). The electoral certification easily falls within this broad understanding of "administration of justice," because it involved Congress's performance of duties required by law. *See* U.S. Const. art. II, § 1, cl. 3; 3 U.S.C. §§ 15-18.

Further, U.S.S.G. § 2J1.2 applies to an array of obstruction statutes, including a number that do *not* involve the "administration of justice" in the narrow sense that Sills advocates (i.e., relating to judicial proceedings). *See* U.S.S.G. § 2J1.2 cmt.; U.S.S.G. Appendix A; 18 U.S.C. §§ 551 (concealing or destroying invoices or papers relating to imported merchandise); 665(c) (obstructing an investigation under the Workforce Innovation and Opportunity Act); 1505 (obstruction of proceedings before departments, agencies, and committees), 1511 (obstruction of enforcement of state gambling laws), 1512 (obstruction of official proceedings), 1516 (obstruction of a federal audit), 1519 (destruction of documents in agency investigations); 26 U.S.C. § 7212 (interfering with the administration of the Internal Revenue Code). Yet, under Sills's interpretation of the guideline, enhancements under §§ 2J1.2(b)(1)(B) and (b)(2) would not apply to any of those statutes.

The Supreme Court has made clear that a term can have a different meaning in the Sentencing Guidelines than it does in a statute. *DePierre v. United States*, 564 U.S. 70, 87 (2011). And, as noted above, the guideline here (unlike 18 U.S.C. § 1503) includes its own definition focused on the "administration of justice," which covers "governmental *or* court" resources and intentionally applies to a wide variety of obstruction statutes, of which 18 U.S.C. § 1503 is but one.

In *United States v. Rubenacker*, 21-cr-193 (BAH), the Chief Judge found that the defendant's argument that the phrase "the administration of justice" is limited to the activities of courts or grand juries unpersuasive. See *United States v. Gregory Rubenacker*, 21-cr-193 (BAH), Sentencing Hearing Tr. 62:3-6. Citing the U.S. Supreme Court decision in *United States v. Aguilar*, 515 U.S. 593 (1995), and specifically Justice Scalia's concurring opinion, the Court found that the omnibus clause was one of the several distinct and independent prohibitions contained in § 1503 and explained Justice Scalia's understanding that were the due administration of justice to apply only to judicial and grand jury proceedings would render it superfluous. Thus, both the majority opinion and the concurrence by Justice Scalia, clearly understood the due administration of justice to be a much broader category that included but was not limited to judicial proceedings referenced in this statute at Section 1503. See *United States v. Gregory Rubenacker*, 21-cr-193 (BAH), Sentencing Hearing Tr. 63:1-18. Additionally, the Court noted that terms may and regularly do carry different definitions when appearing in a statute versus a guideline. *DePierre v. United States*, 564 U.S. 70, 88 (2011). Yet, the "trappings" of the January 6 certification of the electoral college vote, did, in fact, have the features that easily fall within the contours of the phrase "administration of justice": a formal hearing before an official body, that requires the Congress to convene and conduct official business, consider objections, and render a final decision, at a specific time, hour and place, with the Vice President as the presiding officer. See *United States v. Gregory Rubenacker*, 21-cr-193 (BAH), Sentencing Hearing Tr. 65:24-66:22.

Notably, there are judges on this Court who have applied at least one, and sometimes both, of the "administration of justice" enhancements in the context of the Capitol breach on January 6,

in cases where the parties agreed to their application. *See, e.g.*, *United States v. Duke Wilson*, No. 21-cr-345 (Lamberth, J.); *United States v. Paul Hodgkins*, No. 21-cr-188 (Moss, J.); *United States v. Scott Fairlamb*, No. 21-cr-120 (Lamberth, J.); *United States v. Jacob Chansley*, No. 21-cr-003, (Lamberth, J.); *United States v. Matthew Miller*, No. 21-cr-075 (Moss, J.); *United States v. Gregory Rubenacker*, No. 21-cr-193 (Howell, C.J); *United States v. Guy Reffitt*, No. 21-cr-032 (Friedrich, J.). The PSR therefore correctly includes the "administration of justice" enhancements here. PSR at pages 23-24.

### 2. The Enhancement Regarding Injury or Property Damage Should Apply as a Factual Matter

Probation also correctly concluded that both enhancements apply to Sills's conduct. PSR at ¶¶ 65-66, pages 13-14. Sills was on the grounds of the U.S. Capitol for an hour, joining the violent mob of people who assaulted officers and damaged property—all while Congress was, by law, required to be engaged in a joint session to certify the Electoral College vote of the 2020 presidential election. Sills was prominently involved in the violence at the Lower West Terrace tunnel entrance to the Capitol building, where officers were forced to go defend against an ever-growing mob attempting to enter the building. Sills has been convicted with violently taking a baton from a police officer, and subsequently using it to injure those standing between him and the Capitol. All of this conduct resulted in "substantial interference with the administration of justice," because it contributed to the "unnecessary expenditure of substantial governmental . . . resources," warranting the enhancement under U.S.S.G. § 2J1.2(b)(2). And the physical and violent manner in which Sills substantially interfered with the administration of justice warrants additional punishment.

The Chief Judge also addressed a factual challenge to the application of U.S.S.G. § 2J1.2(b)(1)(B) in *Rubenacker* based on that defendant's argument that his actions on January 6, 2021, did not cause or threaten physical injury to any person or damage any property. In *Rubenacker*, the defendant joined the mob that chased U.S. Capitol Police Officer Eugene Goodman up the stairs outside of the Senate Chamber, refused to leave the building when officers in the Ohio Clock Corridor tried to disperse the crowd, joined in a face-off confrontation with officers in the Rotunda, and sprayed liquid from a plastic water bottle at an officer. *See United States v. Gregory Rubenacker*, 21-cr-193 (BAH), Sentencing Hearing Tr. 56:19-59:19. Chief Judge Howell determined that all of this conduct was relevant, and was indeed threatening towards the multiple police officers protecting the Capitol and members of Congress during the certification of the 2020 Electoral College vote, rendering the provision applicable. *See United States v. Gregory Rubenacker*, 21-cr-193 (BAH), Sentencing Hearing Tr. 60:7-20.

Similarly, all of Sills's conduct noted above threatened officers defending the Capitol; moreover, Sills joined with the mob assaulting police in the tunnel, and he struck Officers C.W. and V.B., likely contributing to the injuries they suffered. Additionally, all of this conduct contributed to the delay of the Congressional proceeding which did not restart until about 8:00 p.m., after police officers and National Guard soldiers removed every rioter from the building. Thus, all of Sills's conduct on January 6, 2021 is relevant conduct, and it satisfies both enhancements under U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2). *See* U.S.S.G. § 1B1.3 ("Unless otherwise specified, . . . specific offense characteristics . . . shall be determined on the basis of . . . *all* acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or

willfully caused by the defendant . . . [and] all harm that resulted from the acts and omissions specified . . . above, and all harm that was the object of such acts and omissions.").

Should this Court decline to apply either adjustment under U.S.S.G. § 2J1.2, the government will nevertheless seek an upward variance to offense level 30, and ask the Court to impose a sentence of 108 months' incarceration, as described below. The very conduct that supports the application of these enhancements warrants such a variance. Sills threw pole-like objects at police on the West Front, and then followed them as they retreated into the tunnel, where he pointed a flashing strobe light at them and assaulted them with a baton he had stolen from one of them, all as police attempted to protect members of Congress who had gathered to certify the election. There is no doubt that the interference with the Congressional proceeding that resulted from Sills' continuance breach and assaultive conduct was substantial.

### B. Grouping

Pursuant to U.S.S.G. § 3D1.2(c), the PSR correctly grouped the Section 1512(c)(2) and 111(a)(1) and (b) offenses as one group, and the Section 2111 offense as a separate group. The § 1512 and the § 111 group under §3D1.2(c) because the § 1512 has a specific offense characteristic or Chapter 3 adjustment (the +8 increase under §2J1.2 for "physical injury to a person, or property damage, in order to obstruct the administration of justice") that embodies the assault on the law enforcement officer. 18 U.S.C. § 2111 is not a specific offense characteristic of another count, and has a different victim than 18 U.S.C. § 111(a)(1) and (b), therefore is in a separate group.

### C. Combined Offense Level

Because Count 34, obstruction of an official proceeding, is the most serious count comprising the first group—*i.e.*, because it has the highest offense level of the counts in the group—its offense level constitutes the combined offense level for the first group, which is 31. Group One, therefore, is 1 unit. Count 13, 18 U.S.C. § 2111, has the offense level 28, three fewer than the first group, giving it 1 units. Pursuant to U.S.S.G. § 3D1.4, with 2 units total, the base offense level of the highest group is raised 2 level. Therefore, the Combined Adjusted Offense Level is 33. Per U.S.S.G. § 3E1.1, the defendant's acceptance of responsibility reduces the estimated guidelines range by 3 points, to level 29.[8] Thus, the Combined Adjusted Offense Level is 30.

### D.  Sentencing Guidelines Range

The defendant has no criminal history score, and therefore the Criminal History Category is I. Pursuant to U.S.S.G. § 5, Part A, the government submits that the defendant's total combined offense level is 30, criminal history category is I, and his estimated sentencing guidelines range is 97 to 121 months' imprisonment. In addition, pursuant to U.S.S.G. § 5E1.2, should the Court impose a fine, at Guidelines level 30, the estimated applicable fine range is $30,000 to $300,000.

### VI.  SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

---

[8] As noted on the record at the hearing for the stipulated trial, the government has agreed thatSills is entitled to the 3 point acceptance of responsibility reduction in U.S.S.G. § 3E1.1, because he stipulated to the government's evidence, such that the government did not need to expend the resources for a contested trial, and entered into this disposition in advance of his scheduled trial date.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Sills's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the Certification Vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Sills's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 108 months.

### B.  The History and Characteristics of the Defendant

Sills has no prior arrests or convictions. But Sills's crimes on January 6 were not an opportunistic event, borne out of chance and frenzy. They came, instead, after Sills made the considered decision to arm himself with a gas mask, googles, gloves and ear protection, and to come to the nation's capital from Mehanicsville, Virginia. His prior planning and violent actions on January 6th must weigh heavily on the Court's consideration of this sentence.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Sills's criminal conduct—stealing the defensive weapon of a law enforcement officer to use against that officer and others who were guarding the entrance to the U.S. Capitol—was the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[9] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Although Sills has a criminal history category of I, the government has concerns about possible recidivism. Sills has accepted responsibility through a stipulated trial, but has expressed little remorse and contrition, and his social media statements after January 6 were those of a man proud of his actions.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

---

[9] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

## F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[10]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here—indeed, no January 6th defendant has yet been sentenced to these three

---

[10] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

offenses—the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Though no January 6th defendant has been convicted of violations of all three statutes charged here, several had notably violent conduct towards officers and have received sentences that comport with the government's request here. For example, in *United States v. Thomas Webster*, 21-cr-208, Judge Mehta sentenced the defendant Thomas Webster after a jury trial to 120 months' incarceration. That case involved a protracted physical assault against a single officer who the defendant had picked out from the police line on the West Front. Defendant Webster was convicted of 18 U.S.C. §111(b), among other crimes, for using a flagpole in his assault on the officer, while he defended the Capitol. The government sought a guidelines sentence, which were significantly higher than here (210 to 262 months), because the defendant obtained multiple enhancements for destroying evidence and using body armor. He also did not receive acceptance for responsibility and lied under oath during trial.

In *United States v. Robertson*, 21-cr-34, Judge Cooper sentenced defendant Thomas Robertson to 87 months of incarceration following his conviction to one count of 18 U.S.C. § 1512(c)(2) and one count of 18 U.S.C. § 231(a)(3). Leading up to January 6, the defendant advocated on social media for the use of violence to overturn the election results. Robertson traveled to Washington, D.C. prepared; he packed a gas mask, food, and a large wooden stick. While on the West Front of the Capitol, the defendant joined a crowd of rioters blocking MPD's Civil Disturbance Unit that was struggling to move through the crowd on the West Plaza where the unit planned to reinforce the Capitol Police line. The defendant stood temporarily in front of

the officers, blocking their path and raising his wooden stick in "port arms." The officers had to physically move the defendant to make their way through and, when they did, the defendant struck two officers with his stick. The defendant then joined the mob of rioters and advanced to the Upper West Terrace and into the Capitol building. The defendant made it into the Crypt but eventually left when ordered to do so by law enforcement. After January 6, the defendant bragged that he was proud of his conduct and destroyed his cell phone. Like defendant Robertson, Sills came to Washington, D.C. prepared for violence and joined the mob of rioters on the West Front, engaged with police, and bragged about his conduct on January 6. Unlike defendant Robertson, Sills was convicted of assault with a deadly weapon; Sills did not merely raise a stick in "port arms," and his weapon did not merely strike two officers – instead, Sills repeatedly struck officers with a stolen police baton – and that, after having thrown pole-like objects at police on the West Front and flashing a strobe light at them in the tunnel.

The government is aware that this Court recently sentenced one of Sills's co-defendants, David Lee Judd, to 32 months' incarceration for his convictions of violating Section 1512(c)(2) and Section 111(a) and (b). Judd threw an object that appeared to be a firecracker into the tunnel, which was incredibly dangerous; but, Judd primarily assaulted officers from afar. Unlike Judd, Sills stole a police baton and repeatedly assaulted officers with the it at the very front of the police line in the tunnel. Also distinctly, Sills arrived at the nation's Capitol armed with a gas mask, goggles, and ear plugs, prepared for violence to occur. And he meted out that violence against law enforcement officers whenever he got the chance.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. See 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).[11]   Both require

---

[11] While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of

identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[12]   *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" *United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[13]   *United States v. Gushlak*, 728 F.3d 184,

---

a plea agreement.  *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see also United States v. Zerba*, 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice*, 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020).  The defendant in this case did not enter into a plea agreement.

[12] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA.  *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[13] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review."  *Fair*, 699 F.3d at 513.  Here, the Court should find that Sills's conduct in attacking law enforcement officers on the West Front and Lower West Terrace, who attempted to keep rioters from entering the building through the broken door at

196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a

---

the head of the tunnel, warrants restitution.

physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[14]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Sills to pay $2,000 in restitution for his convictions on Counts 13, 15 and 34. This amount fairly reflects Sills's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution

---

[14] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. See 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 108 months' incarceration, the midpoint of his applicable guidelines range, 36 months' supervised release, $100 mandatory assessment, and $2000 restitution to the Architect of the Capitol.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:  _____/s/_____
KIMBERLY L. PASCHALL
Assistant United States Attorney
National Security Section
D.C. Bar No. 1015665
601 D Street, N.W.,
Washington, D.C. 20530
202-252-2650
Kimberly.Paschall@usdoj.gov